UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-148 |
| | ) | (Phillips / Guyton) |
| VICENTE CORONA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate [Doc. 335]. This matter is before the Court on defendant Vicente Corona's ("Corona") Motion to Suppress Any Alleged Statements Of Defendant Obtained In Violation Of The Right To Counsel Under U.S. Const. Amend. VI [Doc. 333]. The Court conducted an evidentiary hearing on August 2 and 15, 2007.[1] The government and the defendant asked for leave to file post-hearing briefs, which was granted. The defendant also requested oral argument, which was granted. The post-hearing briefs were filed on September 16, 2007 [Doc. 368] and September 28, 2007 [Doc. 372]. The parties argued the matter on October 31, 2007 [Doc. 375].

---

[1] A transcript of the evidentiary hearing has been filed for use by the court [Docs. 351, 352, 358].

1

**ISSUE**

The issue before the Court is whether several of Corona's former fellow inmates at the Blount County Detention Center ("the Jail") will be barred from testifying at trial about incriminating statements allegedly made to them by Corona at the Jail, based on Corona's Sixth Amendment right to counsel.

**POSITIONS OF THE PARTIES**

Both sides agree that informant, inmate witnesses who are acting as government agents can not testify as to information told to them by a fellow inmate, such as Corona. Corona asserts that the inmate witnesses in question "either had written cooperation agreements in place with the government and/or like understandings with the government concerning their cooperation prior to and during the time in which they allege that they elicited statements" from him, and so were acting as government agents [Doc. 368]. The government argues that law enforcement did not instruct the inmate witnesses to obtain information from Corona, or any other particular defendant, and therefore, they were not government agents [Doc. 372]. Corona, in reply, argues that even though the inmate witnesses were not instructed to target him, "it was an essential component of their cooperation with the government that they obtain and provide information concerning the criminal conduct of others, and no time restrictions or other like limitations were placed on the cooperation these informants were to provide." [Doc. 368].

# FACTS

Initially, Corona challenged the prospective trial testimony of six federal inmates concerning information alleged to have been relayed to them by the defendant during their pretrial incarceration. Those six inmates were Dennis Richardson, Jermaine Hughes, Gelone Bowden, Robert Castro, Tommy Jones and Robert Smith. In his post-hearing brief, however, the defendant withdraws his Sixth Amendment challenge to the testimony of Dennis Richardson and Jermaine Hughes, because neither of them, at the time they received information from Corona, were "acting on behalf of any express or implied understandings with the government to provide information concerning the criminal conduct or activities of others." [Doc. 368]. Therefore, the Court will review the testimony regarding the remaining four inmate witnesses.

**A. Gelone Bowden**

Gelone Bowden ("Bowden") is a federal inmate. He and the defendant were housed in the same pod of the Jail from November 3, 2006 to April 13, 2007.

Knoxville Police Department ("KPD") Officer Bruce Conkey ("Conkey"), who works with the KPD narcotics division and with the Drug Enforcement Agency ("DEA") task force, participated in the investigation that led to the federal indictment of Bowden. Conkey debriefed Bowden on December 13, 2006, after Bowden entered into a cooperation Plea Agreement with the government. Bowden's Plea Agreement states, in pertinent part, as follows:

> 6. The defendant further agrees to cooperate completely and truthfully with any and all law enforcement agents and the United States Attorney's Office's personnel. This cooperation includes, but it not limited to, meeting with and being interviewed by such law enforcement agents or United States Attorney's personnel whenever requested.

It was Bowden's understanding under the terms of his agreement with the government that he was facing a mandatory life sentence, and that the only way to obtain a lesser sentence was to provide information to the government concerning the criminal conduct of others and convince the government that his cooperation was substantial. This was not Bowden's first experience with a cooperation Plea Agreement. When charged federally on a previous occasion, Bowden entered into a cooperation agreement and provided information on other individuals in order to obtain a lesser sentence.

Several months after Bowden's most recent agreement with the government was effective, Bowden called Conkey, reporting that he had information about Corona. Bowden then met with law enforcement in 2007, and provided information to the government concerning alleged statements made by Corona at the Jail.

While they were housed at the Jail, Bowden engaged Corona in conversation while they were working out, playing dominoes, and other related activities. Bowden testified that no office or agency of law enforcement ever directed him to monitor or to have conversations with Corona while housed at the Jail.

Bowden did not obtain any of the alleged inculpatory statements attributed to Corona until sometime after December 12, 2006, when Bowden signed his cooperation Plea Agreement with the government.

Bowden made some notes of the comments made to him by Corona. He testified that no one told him to make notes, but he did give them to Conkey. Bowden testified that he engaged in conduct that he knew would get Corona to speak about his pending case. He said he thought that the information would be valuable to him in his attempt to get his sentence lowered.

4

### B. Robert Castro

Robert Castro ("Castro") is a federal inmate. He and the defendant were housed in the same pod of the Jail from September 20 to 29, 2006, and October 9, 2006 to April 13, 2007.

Castro first became housed in the Jail in September, 2006, due to his arrest on a federal fugitive warrant resulting from his escape from Bureau of Prisons custody in Michigan. Castro had pleaded guilty to narcotics and firearms offenses in Michigan, pursuant to a Plea Agreement dated June, 2000. Castro's 2000 Michigan Plea Agreement states, in pertinent part, as follows:

> **3. Cooperation**
>
> **A. Truthful Information and Assistance.**
>
> Defendant promises to provide truthful and complete information to the United States Attorney's Office and to other law enforcement agencies, including a full debriefing. . . . The defendant agrees to cooperate in good faith, meaning that the defendant will not only respond truthfully and completely to all questions asked, but will also volunteer all information that is reasonably related to the subjects discussed in the debriefing. . . .

At the time of his capture in Tennessee, Castro still had ten (10) years remaining on the reduced sentence he received for those offenses as a result of his cooperation. The same United States Attorney's Office in Michigan that prosecuted Castro for the underlying narcotics and firearms offenses, and the office that had entered into a cooperation agreement on behalf of the United States with Castro, is the same office that could potentially prosecute Castro for his escape from Bureau of Prisons' custody.

Upon his arrest by federal agents in Tennessee and his placement in the Jail, Castro believed that he would be sent back to Michigan, and that he was continuing to serve the time from

his sentence in Michigan. He did no know whether he would be charged with additional federal offenses in Tennessee. Castro began cooperating with Tennessee law enforcement in an effort to negotiate an agreement in his Tennessee case. Castro was interviewed and provided information to law enforcement in September and October of 2006, although he did not talk with the authorities about Corona during that time. It was his understanding that the information he was to provide involved criminal activity in general.

Castro started talking with Corona in September, 2006. In fact, Castro testified that Corona was the first person he talked to when he was put in the Jail. In November, 2006, Castro began to make notes of his conversations with Corona. He hoped to get some "credit" in Tennessee if law enforcement brought charges against him in Tennessee. He did not expect to get any credit in Michigan for cooperating with the Tennessee authorities.

Castro also made notes about information concerning other inmates. The purpose of making the notes, according to Castro, was to share them with the authorities to gain some assistance for himself.

Castro testified that no one with any office or agency of law enforcement asked him to get information from Corona, or any other inmate. He further testified that the did not have a Plea Agreement with the government at the time he got information from Corona.

Castro was appointed counsel by the Court in January of 2007. He then discussed the notes he had written and his information concerning Corona with his attorney. Castro's lawyer sent a memorandum dated March 23, 2007, to the government, along with the handwritten notes made by Castro of his purported conversations with Corona. Castro was then debriefed by agents of the government on June 26, 2007. A cooperation Plea Agreement for Castro's criminal offenses

in Tennessee was proffered to Castro sometime in early July 2007. Castro executed the Plea Agreement on August 6, 2007. Castro has provided no information purportedly from Corona after this date.

      **C.**      **Tommy Jones**

Tommy Jones ("Jones") is a federal inmate. He and the defendant were housed in the same pod at the Jail from February 15 to 22, 2006, and they were in the same administrative segregation pod from July 5 to August 29, 2006. During the time the two were housed in the same administrative segregation pod, they were not cellmates, and inmates from different cells in the segregation unit were not allowed out of their cells to associate in the common area of the unit at the same time. Before Corona arrived in the pod housing Jones, no agency or office of law enforcement had asked Jones to monitor or question Corona when he arrived, nor was any such request made while Jones and Corona were in a pod together.

Jones began cooperating shortly after his arrest, and he has been interviewed by law enforcement on multiple occasions. He has provided information concerning the illegal activities of persons with whom he was associated prior to his arrest, and he has also provided information to the government he has allegedly obtained from other inmates, including Corona, with whom he has been in Jail since his arrest.

Jones and his counsel entered into a <u>Kastigar</u> immunity agreement with the government on July 28, 2005. The <u>Kastigar</u> use immunity agreement entered into between Jones and the United States provided that Jones was to give full, complete, and truthful information to the government, and in consideration the government would not use the information against Jones in any criminal case, and that the government could make derivative use of the information to pursue

7

any investigative leads. Jones' attorney, Robert Vogel, testified that the Kastigar use immunity agreement with the government was entered into in order to further negotiations concerning a cooperation Plea Agreement.

At some point in time after Corona arrived in the same pod of the Jail with Jones, Jones contacted Robert Vogel and informed him of information which he had heard from Corona, which he could provide to the government, consistent with the cooperation he had already provided. As a result, Jones was interviewed by law enforcement on March 8, 2006. During the interview, Jones provided information concerning alleged statements made to him by Corona while they were incarcerated at the Jail. During that interview, however, Jones was not instructed to monitor or question Corona.

Jones also made handwritten notes about his conversations with Corona. He started making the notes before he signed his Plea Agreement, and he gave them to his lawyer, to give to law enforcement, before he signed his Plea Agreement. Jones testified that no one with law enforcement asked him to take notes of Corona. On March 9, 2006, Jones executed a Plea Agreement. No one told him at that time to monitor or question Corona.

**D. Robert Smith**

Robert Smith ("Smith") is a federal inmate. He was housed in the same pod at the Jail with Corona from February 15 to 22, 2006. Smith was arrested on November 18, 2005, and he was taken to the Jail. Smith entered into a Plea Agreement with the government on December 16, 2005.

Smith's Plea Agreement states, in pertinent part, as follows:

5. The defendant further agrees to cooperate fully, truthfully, and completely with any and all law enforcement agents, including but

> not limited to, personnel of the United States Attorney's Office. This cooperation includes, but is not limited to, meeting with and being interviewed by such law enforcement agents or United States Attorney's personnel whenever requested.

Smith testified that his understanding of the Plea Agreement was that it did not limit the information he was to provide to specific individuals, such as only those persons with whom he had engaged in criminal conduct. Smith testified that it was his understanding that he was required by his contract with the government to provide information about anyone engaged in criminal conduct.

At the time Smith signed the Plea Agreement, he had not had any conversations with Corona. Smith had discussions with Corona in the Jail after December, 2005, and specifically, during February, 2006. Before Smith had any conversations with Corona in the Jail, no agency or office of law enforcement asked him to talk with Corona. Nor did any agency or office of law enforcement give him any direction about getting information from Corona, or any other inmate at the Jail. Smith was interviewed on March 2, 2006, concerning information about Corona. This interview was conducted pursuant to Smith's cooperation agreement with the government.

### E. Additional Testimony

Chuck Pittman ("Pittman"), Deputy United States Marshal, testified that he has been in charge of federal prisoner coordination at the Jail for the past five (5) years. Pittman stated that no one with the United States Attorneys Office, D.E.A., U.S. Postal Service, or any other law enforcement agency ever asked him, or anyone in his department, to place another inmate in a pod with, or in a cell with, or otherwise near Corona.

D.E.A. Task Force Officer Bruce Conkey testified that he first interviewed Bowden

on December 13, 2006, and that during that meeting he did not question Bowden about Corona, and Bowden did not raise the subject of Corona. Conkey further testified that he did not instruct Bowden to monitor Corona or any other inmate at the Jail, nor did he instruct anyone at the Jail to place any inmate near Corona.

Conkey testified that in late Spring 2007, he received a telephone call from Bowden during which Bowden stated that he had information regarding Corona. Conkey did not discuss Corona with Bowden, but referred Bowden's call to another investigator working on Corona's case.

D.E.A. Special Agent Phil Rust ("Rust") testified that he interviewed Bowden on June 12, 2007. At the time of this interview of Bowden, Corona had been removed from Bowden's pod. Rust testified that he never instructed the Jail to place any inmate near Corona.

Rust also testified about the March 8, 2006 interview of Jones. Rust said that during that interview, Jones was not instructed to monitor Corona, or any other inmate. Rust testified that the next meeting between federal law enforcement and Jones related to Corona occurred on August 31, 2006.[2]

---

[2]Jones testified that between his March 8, 2006 and his August 31, 2006 meetings with law enforcement regarding Corona, he and Corona were in the same pod. Jones, however, stated that he could recall only two topics that Corona discussed that he had not already talked about during their previous housing together in a different pod, those topics being the death of the defendant's brother and the defendant's wish to have Dennis Richardson killed for cooperating with the government.

## LAW AND ANALYSIS

Amendment VI of the Constitution of the United States provides, in pertinent part, as follows:

> In all criminal prosecutions, the accused shall enjoy the right. . . to have the Assistance of Counsel for his defense.

Once the right to counsel has attached and has been asserted, the government "has the affirmative obligation to respect and preserve the accused's choice to seek this assistance." Maine v. Moulton, 474 U.S. 159, 170 (1985). Accordingly, "the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." Id., at 171. Specifically, "once a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of his lawyers." Kuhlman v. Wilson, 477 U.S. 436, 457 (1986) (quoting Massiah v. United States, 377 U.S. 201, 206 (1964).

The issue in the present case, as raised by the testimony of Bowden, Smith, Castro and Jones, is whether an inmate becomes a government agent under Massiah in the absence of instruction to monitor a particular defendant, even if the informant has entered into a general cooperation Plea Agreement or has previously cooperated with the government in another matter. The government argues that all incriminating statements by a particular defendant to an inmate who has not been instructed to monitor that particular defendant are admissible against that defendant at trial without offending the Sixth Amendment's right to counsel. Corona, citing United States v. Henry, 447 U.S. 264, 270 (1980), argues that once an inmate executes a general cooperation agreement, or otherwise has a general intent to assist the government by providing information, then

11

that inmate is a government agent.

During oral argument, the parties agreed that the Sixth Circuit has not articulated a test for determining when an inmate becomes a government agent under Massiah – the triggering event for the constitutional bar to the inmate's deliberate elicitation of incriminating information from an indicted fellow inmate. The government further asserts that the Supreme Court also has not set out such a test. The defendant, on the other hand, argues that by extrapolation "into the modern vernacular," the language of Massiah, Henry and Moulton can be interpreted to establish the test argued for by the defendant. The Court, after careful review of the case law, must disagree with the defendant. The Supreme Court's decisions in Henry and Moulton involved situations where the Court assumed that the government agency relationship existed, and the only issue was whether the informant deliberately elicited incriminating statements by the defendant. Neither the Supreme Court's nor the Sixth Circuit's Massiah jurisprudence has directly addressed a situation involving the government's effort to offer a defendant's incriminating statements through an inmate, where that inmate has not been instructed to monitor the particular defendant at issue, but where that inmate has previously cooperated in another matter or has entered into a general cooperation agreement.

After reviewing the case law cited by the parties, the Court is persuaded that the test for agency is as follows: regardless of whether the inmate informant had entered into a cooperation agreement with the government, or had cooperated with authorities in the past, law enforcement must have instructed or requested that the informant obtain information from a particular defendant in order for the informant to be acting as a government agent relative to incriminating statements made thereafter by the particular defendant to the informant. This test is consistent with the case

12

law in a majority of the circuits which have addressed the question of how to determine the right to counsel issue under Massiah. In particular, the First, Second, Fourth, Seventh, Eighth, Eleventh, and District of Columbia Circuits, have either expressly adopted the test now embraced by this Court, or opined in a manner which supports it. United States v. LaBare, 191 F.3d 60, 65-66 (1st Cir. 1999) ("where the government asks a jail mate to report incriminating statements by anyone but has in no way focused the jail mate's attention on an individual defendant, it is a stretch to describe the jail mate's inquires of the defendant as government interrogation."); United States v. Birbal, 113 F.3d 342, 346 (2nd Cir. 1997) (where the informant's cooperation agreement with the government did not require him to elicit information from any particular defendant, "the Sixth Amendment rights of a talkative inmate are not violated when a jail mate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant."); United States v. McFadden, 187 F. App'x 290, 294 (4th Cir. 2006) (for agency, government must have directed informant to elicit incriminating statements from defendant); United States v. D.F. (63 F.3d 671, 682 n.16 (7th Cir. 1995) (central question is whether the government directed the informant to get incriminating information from the defendant); Moore v. United States, 178 F.3d 994, 999 (8th Cir. 1999) (an informant becomes a government agent only when the informant has been instructed by law enforcement to get information about the particular defendant); Stano v. Butterworth, 51 F.3d 942, 946 (11th Cir. 1995) (jailhouse informant, with a cooperation agreement, is not a government agent where the informant received no instruction from law enforcement to do anything regarding the defendant); United States v. Watson, 894 F.2d 1345, 1347 (D.C. Cir. 1990) ("we join the circuits that have expressly 'refuse[d] to extend the rule of Massiah and Henry to situations where an individual acting on his own initiative, deliberately elicits

incriminating information").

The Court finds that based upon this body of case law, and because such a test provides clear guidance to law enforcement and defendants on the issue, the test for government agency embraced by this Court is not only proper, but mandated. The Court further finds that Bowden, Castro, Jones and Smith were not instructed or requested to monitor Corona, or otherwise engage Corona in conversation in any manner in an effort to elicit incriminating statements from him. Therefore, applying the appropriate test to the facts in this case, the only conclusion which the Court can reach is that Bowden, Castro, Jones and Smith were not acting as government agents at any time when Corona allegedly made incriminating statements to them, and accordingly, Corona's Sixth Amendment right to counsel is not violated by the testimony of Bowden, Castro, Jones and Smith.

## **CONCLUSION**

For the foregoing reasons, the Court respectfully **RECOMMENDS** that defendant Vicente Corona's Motion to Suppress Any Alleged Statements Of Defendant Obtained In Violation Of The Right To Counsel Under U.S. Const. Amend. VI **[Doc. 333]** be **DENIED**.[3]

Respectfully submitted,

s/ H. Bruce Guyton

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

United States Magistrate Judge